# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JENNIFER JO BRODERICK,

    *Plaintiff,*

*v.*

KILOLO KIJAKAZI,
Acting Commissioner of Social
Security,

    *Defendant.*

_____/

CASE NO. 2:21-cv-12480

HON. MARK A. GOLDSMITH
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 10, 12)

## I.    RECOMMENDATION

Plaintiff Jennifer Jo Broderick challenges the Commissioner of Social Security regarding a final decision denying her claim for Disability Insurance Benefits ("DIB"). The case was referred to the undersigned for review. (ECF No. 2); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3). For the reasons below, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 10), and **GRANTING** the Commissioner's motion (ECF No. 12).

## II.  <u>REPORT</u>

### A. Introduction and Procedural History

On December 9, 2016, Plaintiff applied for DIB, alleging disability as of June 30, 2015. (ECF No. 7-5, PageID.355).  She alleges disability due to depression, anxiety, a head injury, tremors, and Post Traumatic Stress Disorder ("PTSD").

Following the denial of the claim at the initial level, Plaintiff requested a hearing, held on August 1, 2018 before Administrative Law Judge ("ALJ") Paul Sher.  (ECF No. 7-2, PageID.96).   On September 28, 2018, ALJ  Sher found that Plaintiff was not disabled. (ECF No. 7-3, PageID.146-160).  On December 17, 2019, the Appeals Council remanded the case for further fact-finding.  (*Id*. at PageID.166-169).   The Appeals Council found that ALJ Sher's conclusion that Plaintiff's migraines were adequately treated with medication was not supported by the treating records or by the opinion of Plaintiff's treating physician.  (*Id*. at PageID.168-169). The ALJ was ordered to obtain additional evidence regarding the alleged impairments; reconsider Plaintiff's residual functional capacity; and "if warranted," obtain additional evidence from a vocational expert ("VE").  (*Id*. at PageID.169).

ALJ Sher held a second hearing on September 22, 2020 at which Plaintiff, represented by attorney Charles Palmer, testified by telephone.  (ECF No. 7-2, PageID.68, 73-88).  A VE also testified.  (*Id*. at PageID.88-93).  On October 20, 2020, ALJ Sher again found that Plaintiff was not disabled.  (*Id*. at PageID.41-59). On August 22, 2021, the Appeals Council denied review of the administrative

decision.  (*Id*. at PageID.27-29).  On October 21, 2021, Plaintiff filed for judicial review of the administrative determination.  (ECF No. 1).

## B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means - and means only - 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide

the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

## C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not

disabled. If you cannot make an adjustment to other work, we will find
that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021); *see also Heston v. Comm'r of
Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears
the burden of proving the existence and severity of limitations caused by [his or] her
impairments and the fact that [he or] she is precluded from performing [his or] her
past relevant work."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir.
2003).  The claimant must provide evidence establishing the residual functional
capacity, which "is the most [the claimant] can still do despite [his or her]
limitations," and is measured using "all the relevant evidence in [the] case record."
20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step
without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*,
459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to
show that "other jobs in significant numbers exist in the national economy that [the
claimant] could perform given [his or] her RFC and considering relevant vocational
factors."  *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

**D. The ALJ's Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff
was not disabled. At step one, the ALJ found that during the period under
consideration Plaintiff had engaged in substantial gainful activity ("SGA") from

5

June 30, 2015 through July 31, 2015 and May 1, 2016 through October 31, 2016 but had otherwise not engaged in SGA. (ECF No. 7-2, PageID.44).   At step two, the ALJ found the following impairments severe: "depression/bipolar disorder; generalized anxiety disorder; and migraine." (*Id*.).   The ALJ found that the conditions of "obesity, epilepsy; degenerative disc disease of the cervical spine C5-C7; mild lumbar degenerative disc disease; tremor; history of [PTSD]; and remote traumatic brain injury" were not severe.   (*Id*. at PageID.44-45).   At step three, he found that none of the impairments met or medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id*. at PageID.45).   The ALJ found that Plaintiff had mild limitation in understanding, remembering or applying information; moderate limitation in interacting with others and in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing herself. (*Id*. at PageID.46).

The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:[1]

> [She] can occasionally climb ramps and stairs, never climb ladders, ropes, scaffolds; occasionally balance; occasionally stoop, kneel,

---

[1] Under 20 C.F.R. § 404.1567(a-d) *sedentary* work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and  exertionally *heavy* work as "involve[ing] lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100

crouch and crawl; avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, noise, and vibration; avoid concentrated exposure to fumes, odors, dusts, etc.; avoid all exposure to unprotected heights and dangerous machinery; can understand, remember, and carry out simple instructions; Perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; interact occasionally with supervisors, and coworkers, and never with the general public.

(*Id.* at PageID.47).

At step four, the ALJ found that Plaintiff could not perform any past relevant work. (*Id.* at PageID.57). At step five, the ALJ cited the VE's testimony in support of his determination that Plaintiff could perform a significant number of jobs in the national economy including exertionally light, unskilled work as a mail clerk, housekeeping cleaner, and inspector. (*Id.* PageID.58). Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.59, 90-91).

### E. Administrative Record

#### 1. Medical Evidence

In June 2015, Plaintiff was admitted for inpatient psychiatric care for six days after reporting thoughts of "crashing her car or overdosing on her medications." (ECF No. 7-7, PageID.659). Discharge records note "some degree of cognitive simplicity and limitations secondary to [the] traumatic brain injury." (*Id.* at

---

pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

PageID.660).    She was discharged in stable condition after exhibiting an improvement in mood.    (*Id*. at PageID.660-661).    February 2016 records by Anastasios Alexiou, M.D.. note that Plaintiff was "[d]oing fine" with Topamax.  (*Id*. at PageID.616).  Plaintiff reported two "significant migraines a week" and two or three "incapacitating migraines a month." (*Id*.).  Dr. Alexiou noted that Plaintiff had been "let go from work without pay" and ongoing "depression, anxiety and anger." (*Id*.).  July 2016 records by neurologist Steven A. Sherman noted Plaintiff's report of headaches "about once per month" lasting up to two to three days.  (*Id*. at PageID.741).  Dr. Sherman noted that Plaintiff was currently performing mailroom work but had recently experienced a "nervous breakdown." (*Id*.).  Plaintiff appeared "alert, attentive, and lucid, with normal speech." (*Id*.).  Dr. Sherman recommended sumatriptan for headaches and a "mindfulness-based stress reduction program." (*Id*.).

In August 2016, Plaintiff was admitted for inpatient psychiatric care for five days after experiencing suicidal thoughts after experiencing family-related stressors, losing her psychiatrist, and PTSD resulting from a former abusive relationship.  (*Id*. at PageID.987-991).  She reported that she read books, watched movies with friends, and watched football games.  (*Id*. at PageID.987).  She exhibited a normal mood and affect at the time of discharge.  (*Id*. at PageID.1001.  September and November 2016 records by Dr. Sherman note good results from prescribed medication.  (*Id*. at PageID. 738, 580).

On May 2, 2017, David Doan, M.D. performed a non-examining review of the records pertaining to Plaintiff's physical condition on behalf of the SSA, finding that she could lift/carry 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push/pull without limitation. (ECF No. 7-3, PageID.135-136). He precluded all balancing and climbing ladders, ropes, or scaffolds but permitted otherwise occasional postural activity. (*Id*. at PageID.136). He found that Plaintiff should also avoid concentrated exposure to temperature extremes, wetness, humidity, noise, vibration, airborne pollutants, and hazards such as machinery and heights. (*Id*. at PageID.137).

Later in May 2017 Dr. Sherman noted Plaintiff's report of pulsating headaches with sweating. (*Id*. at PageID.607). Plaintiff reported five to eight headaches each month lasting around 15 minutes. (*Id*.).

On June 19, 2017, psychologist Michael Brady, Ph.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of constant anxiety resulting in lack of focus, depression, and headaches. (ECF No. 7-7, PageID.601). She she told Dr. Brady that she took Sumatriptan, Topiramate, Divalproex, Fluoxetine, Valacyclovir, Norethindrone, and Trazodone. (*Id*.). She denied previous psychiatric hospitalizations or mental health counseling. (*Id*.). She reported surgery to relieve head pressure following a 1987 car accident.[2]

---

[2] The medical records state that the accident occurred in 1998. (ECF No. 7-7, PageID.616); (ECF No. 10, PageID.1473).

(*Id*.).  She noted that she had been terminated from a recent assembly line position because she was unable to keep up with the production pace.  (*Id*. at PageID.602).  Her daily activities included cleaning and watching television.  (*Id*.).

Dr. Brady observed that Plaintiff had good hygiene, contact with reality, full orientation, and well-organized thoughts and speech with a depressed mood.  (*Id*. at PageID.602-603).  She exhibited normal immediate, recent, and past memory.  (*Id*. at PageID.603).  She was "cooperative and attentive."  (*Id*. at PageID.604).  Dr. Brady noted that "the mental status examination revealed abnormalities in concentration and judgment."  (*Id*.).  He found that Plaintiff's ability to relate with others "impaired"; the ability to understand, recall, and complete tasks, "not . . . significantly impaired"; ability to concentrate, "somewhat impaired"; and ability to withstand normal workplace stressors "somewhat impaired."  (*Id*.).  He opined that due to Plaintiff's "emotional state," her "effectiveness and performance will likely be limited and slowed."  (*Id*.).  He gave her a "moderate" prognosis.  (*Id*.).

June 2017 counseling records note the psychological symptoms of anxiety, anger, excessive sleep, and low motivation.  (ECF No. 7-7, PageID.1194).  Plaintiff exhibited a flat affect, fair insight, impulse control, and soft speech.  (*Id*. at PageID.1186).

On June 28, 2017, Shamika Hall, Ph.D. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that Plaintiff experienced mild limitation in the ability to understand, remember, or apply

information; moderate limitation in the ability to interact with others and concentrate, persist, or maintain pace; and no limitation in the ability to adapt or manage herself.  (ECF No. 7-3, PageID.134).  She concluded that Plaintiff was limited to "simple, unskilled routine work" in a "low-stress work environment with no specific production quotas or requirements" with only "brief and superficial contact" with supervisors, coworkers, and the general public.  (*Id*. at PageID.139).

April 2018 records by Dr. Sherman note Plaintiff's report of two to three headaches each week.  (ECF No. 7-7, PageID.611).  The following month, Dr. Sherman opined that due to multiple headaches each week lasting for up to half a day, Plaintiff was unable to perform any substantial gainful activity.  (*Id*. at PageID.614).  A May 2018 psychological assessment noted Plaintiff's report of worsening depression and anxiety.  (*Id*. at PageID.1168-1179).  September 2018 treating records by Shumaila Younas, M.D. note that Plaintiff experienced difficulty understanding simple questions, noting that the cognitive symptoms could be attributable to Topamax.  (ECF No. 7-8, PageID.1312).  October 2018 records note a recent psychotropic medication change after Plaintiff experienced "seizure-like" activity after drinking alcohol on a hot day at a football game.  (*Id*. at PageID.1316); (ECF No. 7-7, PageID.1225).  November 2018 records note an improvement in mood.  (ECF No. 7-8, PageID.1323).  The same month, Dr. Younas opined that Plaintiff was unable to work due to "her psychiatric history with additional complications secondary to" a traumatic brain injury.  (ECF No. 7-7, PageID.1199).

Dr. Younas' January 2019 records note that Plaintiff was excited about an upcoming cruise but continued to experience the psychosocial stressors of "financial constraints, disability denial and chronic migraines." (ECF No. 7-8, PageID.1330). Dr. Younas' records note that Plaintiff shared pictures from her recent trip to Mexico with a friend. (*Id*. at PageID.1343).

In May 2019, Plaintiff agreed to inpatient psychiatric care after experiencing interpersonal stress living with her parents and anxiety. (*Id*. at PageID.1353); (ECF No. 7-7, PageID.1211). Plaintiff reported that her mood had stabilized following the four-day hospitalization, but she still experienced stress living with her parents. (ECF No. 7-8, PageID.1355). August 2019 records note an upcoming trip to Georgia to stay with a relative. (*Id*. at PageID.1365). January 2020 records by Dr. Younas note that Plaintiff was taking a trip with her sister to celebrate her birthday. (*Id*. at PageID.1369). In March 2020, Plaintiff requested "a letter supporting disability" prior to an upcoming hearing. (*Id*. at PageID.1375). She exhibited full orientation, normal speech, and a good mood. (*Id*. at PageID.1376). In July 2020, Plaintiff was hospitalized for two days for suicidal ideation. (*Id*. at PageID.1431). In August 2020, IQ testing by Michael Vredvoogd, Ph.D., showed a full-scale IQ of 68; perceptual reasoning index of 61; average attention testing, and memory in the low average to moderately impaired range. (*Id*. at PageID.1426-1427). Dr. Vredvoogd opined that Plaintiff was incapable of competitive employment due to "emotional instability" and "deficits in executive functions." (*Id*. at PageID.1430).

### 2.  Plaintiff's Testimony at the September 22, 2020 Administrative Hearing

Plaintiff offered the following testimony:

She was born February 9, 1968.  (ECF No. 7-2, PageID.70).  She lived in a two-story home with her parents in Tecumseh, Michigan. (*Id*. at PageID.73).  She slept, ate, and performed laundry chores on the first floor of the home.  (*Id*.).  Her parents experienced health conditions but were able to care for their personal needs. (*Id*. at PageID.75).  She drove around once or twice a week.  (*Id*.).  She had completed one year of college.  (*Id*.).  She had medical insurance. (*Id*.).

Before ceasing work altogether, Plaintiff worked at an assisted living facility for two months in 2019 as a housekeeper.  (*Id*. at PageID.75-76).  She worked 32 to 40 hours each week. (*Id*. at PageID.76).  She left that position due to her supervisor's "sexual remarks." (*Id*. at PageID.77).  Before that, she worked for 15 years as a surgical instrument technician ("technician").  (*Id*. at PageID.76).  The technician position required her to lift over 40 pounds.  (*Id*.).  She stopped working as a technician because she was being "bullied" by a coworker.  (*Id*.).

In addition to the conditions of depression, bipolar, and anxiety, Plaintiff was unable to work because of headaches.  (*Id*. at PageID.77).  She experienced intermittent, unpredictable headaches since sustaining injuries in a car accident.  (*Id*. at PageID.77-78).  She left both the housekeeping and technician jobs, in part, due to headaches, adding that she was required to take unplanned absences due to the

condition. (*Id*. at PageID.78). She had been hospitalized in July 2020 for a suicidal ideation triggered by her mother's verbal comments. (*Id*. at PageID.79). She also received inpatient mental health treatment in 2019. (*Id*. at PageID.80). The headaches were precipitated by a sharp pain on either side of the head. (*Id*.). The headaches were generally worse on the right side of the head. (*Id*.). They lasted between five and eight hours. (*Id*. at PageID.81). The headaches were relieved by reclining. (*Id*.). She had been taking Imtrex as needed for headaches for two years and also took Sumatriptan. (*Id*. at PageID.81-82). She no longer treated with neurologist Dr. Sherman but saw Dr. "Solerob" instead at the recommendation of her psychiatrist. (*Id*. at PageID.82-83).

Plaintiff experienced difficulty following work-related directions due to her head injury. (*Id*. at PageID.83-84). She had been fired from an assembly line position due to her pacing limitations. (*Id*. at PageID.84). She was able to follow movie plots but was prone to forget what she had just seen or read. (*Id*. at PageID.84).

In response to questioning by her attorney, Plaintiff reported both manic and depressive symptoms of bipolar disorder. (*Id*. at PageID.85). On a typical day, she arose, had coffee, showered, washed dishes, colored, then sat for the rest of the day in her bedroom. (*Id*. at PageID.85). Prozac made her tired. (*Id*.). She took naps every day. (*Id*. at PageID.86). She spent most her time at home and did not socialize with others outside of her family. (*Id*.). In response to further questioning by the

ALJ, she acknowledged that pre-pandemic, she dined out with a friend twice a month. (*Id*. at PageID.86). She managed her own medication and could play games on her smart phone. (*Id*. at PageID.87). She relied on her parents to grocery shop and cook. (*Id*.).

### 3. The Vocational Expert's Testimony

Following Plaintiff's testimony, the ALJ posed the following set of modifiers to the VE, describing a hypothetical individual of Plaintiff's age, education, and work history:

> [L]ight work . . . can occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds . . . occasionally balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, noise, and vibration; avoid concentrated exposure to fumes, odors, dust, et cetera; avoid all exposure to unprotected heights and dangerous, moving machinery; can understand, remember, and carry out simple instructions; perform simple, routine, and repetitive tasks, but not at a production-rate pace, such as assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; interact occasionally with supervisors and co-workers, but never with the general public. Would the individual be able to perform the past work?

(*Id*. at PageID.90). The VE stated that the above limitations would preclude Plaintiff's past relevant work but would allow for the exertionally light, unskilled work of a mail clerk, *Dictionary of Occupational Titles* ("DOT") code 209.687-026 (170,000 positions in the national economy); housekeeping/cleaner, 323.687-014 (700,000); and inspector and hand packager, 559.687-074 (80,000). (*Id*. at PageID.91). The VE testified that if the hypothetical individual were consistently

absent two days a month; required breaks exceeding the customary two 15-minute breaks and one 30-minute lunch breaks; or were off task more than 10 percent of the workday, all competitive employment would be eliminated. (*Id*. at PageID.92). He stated that his testimony was consistent with the information found in the DOT, adding that his findings regarding absenteeism, time off task, social interaction, and pace were based on his own professional training and experience. (*Id*. at PageID.93).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012).  The regulations carve the evidence into categories: "acceptable medical sources" and "other sources."   20 C.F.R. §§ 404.1513, 416.913 (2016).  "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists.   §§ 404.1513(a),

416.913(a). (2016). [3]   "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. §§ 404.1513(d), 416.913(d). (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the

---

[3] Various amendments have been made to the regulations since Plaintiff filed her claim on December 9, 2016. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). I will utilize the regulations in effect when Plaintiff filed her claim. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same)); *Miller v. Comm'r of Soc. Sec.*, No. 1:17-cv-0718, 2018 WL 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *Rep. & Rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *Rep. & Rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. §§ 404.1527, 416.927 (2016). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. §§ 404.1527(c), 416.927(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to

18

dispositive effect deal with the nature and severity of the claimant's impairments. *Id*. The ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d), 416.927(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a listing, the individual's residual functional capacity, and the application of vocational factors. §§ 404.1527(d)(3), 416.927(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

"In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the

symptoms affect your activities of daily living and your ability to work[.]" §§ 404.1529(a), 416.929(a).

But the SSA clarified, stating that "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your

symptoms." *Id.* §§ 404.1529(c)(3), 416.929(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

   (i)    [D]aily activities;

   (ii)   The location, duration, frequency, and intensity of . . . pain;

   (iii)  Precipitating and aggravating factors;

   (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

   (v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* §§ 404.1530(a), 416.930(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* §§ 404.1530(b), 416.930(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* §§ 404.1530(c), 416.930(c).

### G.  Arguments and Analysis

#### 1.  The Assessment of the Medical Opinion Evidence[4]

Plaintiff contends that while the ALJ gave ostensibly "significant" weight to the opinions of the consultative (Dr. Brady) and non-examining (Dr. Hall) sources in support of the RFC for a range of unskilled work, he ignored the portions of those opinions supporting a disability finding.  (ECF No. 10, PageID.1486-92).  She argues further that the ALJ erred by over-relying on her ability to attend sporting events and travel in discounting Dr. Vredevoogd's finding of disabling cognitive limitation.  (*Id*. at PageID.1492-94).

In turn, the Commissioner argues that the accord of "substantial weight" to the consultative and non-examining opinions did not require the adoption or articulation of every one of the discrete findings contained therein.  (ECF No. 12, PageID.1508-13).  The Commissioner contends further that the ALJ did not reject Dr. Vredevoogd's findings based solely on Plaintiff's daily activities but also, that his opinion that Plaintiff was disabled was an "issue reserved to the Commissioner." (*Id*. at  PageID.1517,  1521-22)  citing  (ECF  No.  7-8,  PageID.1430).    The Commissioner notes that while the ALJ rejected Dr. Vredvoogd's findings as to the *degree* of Plaintiff's psychological/cognitive impairment, the RFC for simple work,

---

[4] Plaintiff's arguments pertain only to the opinions by Drs. Brady, Hall, and Vredevoogd,

no production work, and limited interaction with others reflects significant psychological/cognitive limitation. (*Id*. at PageID.1517).

In reply, Plaintiff contends that the ALJ's failure to address or adopt Dr. Brady's more restrictive findings undermines the RFC reflecting only moderate psychological limitation. (ECF No. 13, PageID.1531). With regard to Dr. Hall's opinion, Plaintiff revisits her argument that the ALJ failed to resolve internal inconsistencies between Dr. Hall's finding that Plaintiff could interact "occasionally" with coworkers and supervisors and her closing summary that Plaintiff could have only "brief," or "superficial" interaction with coworkers, supervisors, and the general public. (*Id*.). (ECF No. 13, PageID.1534) citing (ECF No. 7-3, PageID.139).

### a.  Dr. Brady's Consultative Examination

 As discussed above, in June 2017 Dr. Brady examined Plaintiff on behalf of the SSA. (ECF No. 7-7, PageID.602). He noted Plaintiff's report that she had been terminated from a recent assembly line position because she was unable to keep up with the production pace but could perform household chores on a daily basis. (*Id*. at PageID.602). Dr. Brady observations included good hygiene, contact with reality, full orientation, and well-organized thoughts and speech. (*Id*. at PageID.602-603). Plaintiff exhibited normal immediate, recent, and past memory. (*Id*. at PageID.603). She was "cooperative and attentive." (*Id*. at PageID.604). Despite these apparently normal findings, Dr. Brady stated that "the mental status examination revealed

abnormalities in concentration and judgment." (*Id*.).  He found Plaintiff's ability to relate with others "impaired"; the ability to understand, recall, and complete tasks, "not . . . significantly impaired"; ability to concentrate, "somewhat impaired"; and ability to withstand normal workplace stressors "somewhat impaired." (*Id*.).  He opined that due to Plaintiff's "emotional state," her "effectiveness and performance will likely be limited and slowed." (*Id*.).  He gave her a "moderate" prognosis.  (*Id*.).

> The ALJ found as follows:

> I assign the opinion of Dr. Brady significant weight as it was consistent with the medical record and was consistent with the limitations set forth in the residual functional capacity as it relates to occasional interaction with co-workers and supervisors and no interact with the general public and in limiting [Plaintiff] to simple, routine and repetitive tasks not to be performed at a production rate speed and limiting [her] to infrequent changes in the workplace.

(ECF No. 7-2, PageID.54).  In support of his findings, he cited Dr. Younas' treatment records showing that Plaintiff attended sporting events, met friends for lunch, and was able to travel regularly prior to the pandemic beginning in March 2020.  (*Id*. at PageID.54-54).

As a threshold matter, Plaintiff's argument that the ALJ erred by failing to explicitly discuss Dr. Brady's discrete findings that she "may 'often be distracted' and that her 'effectiveness and performance will likely be limited and slowed'" is not well taken.   (ECF No. 10, PageID.1487) citing (ECF No. 7-7, PageID.604).  It is well settled that an ALJ's failure "to discuss all of the testimony and evidence presented to him does not mean that the ALJ failed to consider the evidence.  *Loral*

*Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999) (internal citations and quotations omitted).   "An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Id.* The Commissioner notes correctly that the Social Security regulations "do not require such a slavish articulation requirement when assessing consultative examiners' opinions." (ECF No. 12, PageID.1511-12) (citing *Kondrashov v. Comm'r of Soc. Sec.*, No. 16-cv-14044, 2018 WL 1146875, at *5 (E.D. Mich. Feb. 12, 2018).

Further, Plaintiff's contention that Dr. Brady found a greater degree of impairment than reflected by the RFC is not supported by the record.   The ALJ acknowledged impairments in both social functioning and concentration by finding "moderate," *e.g.* significant limitation in interacting with others and in concentration, persistence, or pace (ECF No. 7-2, PageID.46).   The RFC accounted for the limitations in interacting with others by restricting Plaintiff to occasional interaction with supervisors and coworker and precluding all interaction with the public.  (ECF No. 7-2, PageID.47).   The RFC's limitation to "simple instructions," "simple, routine, and repetitive tasks but not at a production rate," and only "routine changes in the workplace that are infrequent and easily explained" generously captures "moderate" concentrational limitations.  (*Id.*); *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) (moderate concentrational limitations adequately addressed by restricting the claimant to unskilled, routine,

repetitive work).   The RFC's limitation to infrequent, routine changes in the workplace and the preclusion on production work and interaction with public reflect Dr. Brady's finding of some level of impairment in dealing with workplace stress. As discussed further in the next section, the ALJ's finding that Plaintiff did not experience more than moderate psychological limitation is otherwise supported by substantial evidence.

### b.  Dr. Hall's Non-Examining Assessment

In June 2017, Dr. Hall performed a non-examining review of the treating and consultative records on behalf of the SSA, finding moderate limitation in the ability to interact with others and in the ability to concentrate, persist, or maintain pace; and no limitation in the ability to adapt or manage herself.  (ECF No. 7-3, PageID.134). In her concluding paragraph, she stated that Plaintiff was limited to "simple, unskilled routine work" in a "low-stress work environment with no specific production quotas or requirements" with only "brief and superficial contact" with supervisors, coworkers, and the general public.  (*Id*. at PageID.139).

The ALJ provided the following rationale for according "significant weight" to Dr. Hall's opinion:

> [The opinion] was consistent with the overall record. For example, the claimant's psychiatrist consistently reported that her depression and anxiety were improving and her symptoms were stable overall. . . . Mental status examinations by her psychiatrist and neurologists supported no more than moderate limitations. . . . Additionally, there was evidence in the record that the claimant was capable of attaining

several part-time jobs and that she was able to travel occasionally both domestically and internationally with friends and family.

(ECF 7-2, PageID.54).

Consistent with her argument regarding Dr. Brady's findings, Plaintiff contends that the ALJ overlooked the portions of Dr. Hall's findings suggesting disabling limitation.  Specifically, she claims that the ALJ failed to acknowledge or adopt Dr. Hall's discrete finding that Plaintiff "may have moderate difficulties to complete a normal workweek secondary to psychologically based symptoms." (ECF No. 10, PageID.1490) citing (ECF No. 7-2, PageID.139).  However, Dr. Hall qualified this finding by stating that Plaintiff *may* experience difficulty completing a workweek.  The Commissioner is correct that the fact that Plaintiff "*might* have difficulties" does "not support a concrete limitation."  (ECF No. 12, PageID.1515) (citing *Herndon v. Comm'r of Soc. Sec.*, No. 1:20-CV-00885-JDG, 2021 WL 811660, at *21 (N.D. Ohio Mar. 3, 2021)) ("the portions [of the medical opinions] noting that the claimant 'may need' various accommodations are vague. Either the claimant requires the accommodation or she does not. The hedging does not provide clear functional limitations.")).  Second, the ALJ did not state that he adopted Dr. Hall's opinion in its entirety but rather accorded it "substantial weight."  (ECF No. 7-2, PageID.54).  *See Loral Def. Sys.-Akron,* at 200 F.3d at 453.  The ALJ's finding of moderate limitation in interacting with others and concentration are drawn

verbatim from Dr. Hall's findings. (ECF No. 7-2, PageID.46), (ECF No. 7-3, PageID.134).

Plaintiff is correct that at one point in Dr. Hall's assessment, she found that Plaintiff was limited to "brief and superficial interactions with the general public and only occasional interaction with co-workers and supervision" but in her final summary, stated "only brief and superficial contact with supervisors and coworkers, and with the general public." (ECF No. 10, PageID.1491) citing (ECF No. 7-2, PageID.139-140). She faults the ALJ for failing to resolve the internal contradiction in Dr. Hall's opinion. However, Plaintiff does not dispute that the RFC's limitation of occasional (rather than "brief and superficial") interaction with supervisors and coworkers is drawn from a portion Dr. Hall's opinion or that the finding that Plaintiff could interact occasionally with supervisors and coworkers is otherwise supported by substantial evidence. (*Id*. at PageID.47). The ALJ cited Plaintiff's ability to travel regularly with others, attend sporting events, and her cooperation and attentiveness during exams in support of the RFC. (*Id*. at PageID.54). Even assuming that Dr. Hall intended to limit Plaintiff to brief and superficial contact with supervisors and coworkers, the transcript contains substantial evidence supporting the ALJ's conclusion that she could interact occasionally. "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90, 97 (6th Cir. 1999)

(citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  As such, the ALJ's failure to explicitly discuss the contradiction between the two portions of Dr. Hall's opinion does not present grounds for remand.

### c. Dr. Vedevoogd's Testing and Opinion

In August 2020, Dr. Vredevoogd performed a neuropsychological evaluation including IQ testing. (ECF No. 7-8, PageID.1425).  The Wechsler Abbreviated Scale of Intelligence-II test showed a full-scale IQ score of 68, placing Plaintiff in the "mildly to moderately impaired range of the second percentile relative to same-aged peers." (*Id*. at PageID.1429).  The testing further showed a perceptual reasoning index of 61; average attention testing; and memory in the low average to moderately impaired range.  (*Id*. at PageID.1426-1427).  Dr. Vredvoogd opined that Plaintiff was incapable of competitive employment due to "emotional instability" and "deficits in executive functions." (*Id*. at PageID.1430).

The ALJ devoted half a page of his determination to Dr. Vredvoogd's findings.  (ECF No. 7-2, PageID.56).  He rejected Dr. Vredvoogd's opinion that Plaintiff was incapable of competitive employment on the basis that it was an issue reserved to the Commissioner.  (*Id*.); 20 C.F.R. § 1527(d)(1) (March 27, 2017) ("A statement by a medical source that you are disabled or unable to work does not mean

that we will determine that you are disabled.") (internal citations omitted).  The ALJ

also accorded "little weight" to the substance of Dr. Vredvoogd's findings:

> The evidence [does not] support that the claimant was so limited
> cognitively that she would be unable to sustain employment, and there
> was not significant evidence that the claimant was so unstable that she
> could not handle stress. Regarding basic cognitive functions, the
> claimant testified at the 2018 and 2020 hearings that she had a valid
> driver's license; she played several different games such as electronic
> coloring and solitaire on her smartphone for at least an hour at a time;
> and she had sustained attention to watch University of Michigan
> football games; and she could follow a two-hour Lifetime movie. . . .
> At a psychological consultative examination, the claimant correctly
> answered five different math problems presented to her at the
> evaluation; she was able to recall three out of three objects after a three-
> minute delay; and she could recall six digits forward and five
> backwards. . . . That psychologist stated that upon his evaluation of the
> claimant, her ability to understand, recall, and complete tasks were not
> significantly impaired. . . . At a neurological evaluation, the claimant's
> neurologist stated she had good attention, concentration, memory, and
> fund of knowledge. . . . The claimant's psychiatrist noted she had
> "challenges recalling," but her insight and judgment was fair and she
> had logical and goal oriented thought processes. (23F). Dr.
> Vredevoogd's opinion that the claimant had "marked" depression was
> not consistent with the claimant's psychiatrist's treatment notes, as the
> claimant was described as stable overall. . . . Furthermore, the
> claimant's frequent travel to places within the United States and
> internationally were not consistent with someone who could not handle
> stress.

(*Id*. at PageID.56-57).

Plaintiff faults the ALJ for deemphasizing the effect of stress on her work

abilities, noting that over the relevant period, she was hospitalized on multiple

occasions for suicide ideation or cognitive problems.  (ECF No. 10, PageID.1493).

However, the ALJ acknowledged that Plaintiff was hospitalized for several days in

August 2016 after voicing suicidal thoughts but was able to return to work following

a medication adjustment until ceasing work altogether on November 1, 2016.  (ECF

No. 7-2, PageID.49).  The ALJ acknowledged subsequent hospitalizations but noted

that they were brief and that mental status examinations taken shortly after

admittance were relatively unremarkable: September 2018 "seizure-like" activity

requiring hospitalization following Plaintiff's attendance at a football game was

attributed to the combination of alcohol intoxication and prescribed medications.

(*Id*. at PageID.50) citing (ECF No. 7-7, PageID.1229, 1231).  He noted that a May

2019 hospitalization was precipitated by the situational stressors of living with her

elderly parents and lack of financial resources.  (*Id*. at PageID.51) citing (ECF No.

7-7, PageID.1211-12, 18-20).  The ALJ cited hospital records showing the denial of

suicidal thoughts, normal memory, and full orientation.  (*Id*. at PageID.51) citing

(ECF No. 7-7, PageID.1212, 1218).  The ALJ noted that Plaintiff did not seek

treatment between August 2019 and January 2020.  (*Id*. at PageID.52).  He noted

that Plaintiff was "flippant" after being referring for emergency services following

voicing suicidal thoughts and stated that she wanted to be discharged so she could

buy a Halloween costume.  (*Id*. at PageID.52) citing (ECF No. 7-7, PageID.1242-

1243).  The ALJ acknowledged a July 2020 two-day hospital stay but noted that the

records did not detail the purpose of the stay other than a diagnosis of "major

depressive disorder" and a list of medications.[5]   (*Id.* at PageID.52).   The ALJ's findings are consistent with my own review of the hospital records showing that Plaintiff voiced suicidal thoughts on a routine basis in response to minor interpersonal conflicts.   (ECF No. 7-7, PageID.1220, 1242).

Plaintiff's argument that the ALJ downplayed the import of the IQ testing or her cognitive limitations is also without merit.   (ECF No. 10, PageID.1493) (citing *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268 (6th Cir. 1991)).   In *Brown,* the Court found that the ALJ improperly sought to invalidate IQ testing showing a full-scale IQ of 68 on the basis that the claimant could drive, visit friends, make change, do laundry, clean his room, and complete sixth grade. *Id.* at 270.   In contrast here, the ALJ did not seek to invalidate the IQ testing but rather, noted that Plaintiff had completed one year of college; had past relevant semiskilled work; exhibited "linear, logical and goal-directed speech"; traveled domestically and internationally on a regular basis; attended football games; and maintained relationships with her two best friends.   (ECF No. 7-7, PageID.48-57).   While Plaintiff argues that she was "mostly accompanied" on her trips or stayed with family or friends, the ALJ did not err in concluding that her travels (requiring her interact successfully and make plans in tandem with others) supported the non-disability determination.   *Greaves v.*

---

[5] Consistent with the ALJ's findings, my own review of the July 2020 hospitalization records shows that Plaintiff's condition and treatment were not detailed.   (ECF No. 7-8, PageID.1431-1456).   Plaintiff wrote in a self-evaluation that she was "not confident" that she would not attempt suicide in the future.   (*Id.* at PageID.1455).

*Comm'r of Soc. Sec. Admin.*, No. 2:20-CV-12131, 2022 WL 278233, at *8 (E.D. Mich. Jan. 11, 2022) (Altman, M.J.), *report and recommendation adopted sub nom. Greaves v. Comm'r of Soc. Sec.*, No. 20-12131, 2022 WL 275501 (E.D. Mich. Jan. 28, 2022) (ALJ permissibly found that the claimant's allegations of psychological limitation "undermined by her ability to travel to Mexico, which would require traveling and having to be around other people while traveling.") (internal citations omitted); *O'Brien v. Comm'r of Soc. Sec.*, No. 18-11546, 2019 WL 5162859, at *15 (E.D. Mich. Oct. 15, 2019) (Whalen, M.J.), *aff'd,* 819 F. App'x 409, 2020 WL 4559505 (6th Cir. 2020) (The claimant's ability to travel, among other activities, stood at odds with the claimant's allegations of disabling psychological limitation).  Likewise here, the ALJ properly found that Plaintiff's ability to plan and take trips, along with attending sporting events, driving, and reading undermined Dr. Vredevoogd's finding of disabling limitations.

### 2.  Listing 11.02B and SSR 19-4p

Plaintiff argues that the ALJ erred at step three of his analysis by failing to discuss whether her migraine headaches met or medically equaled Listing 11.02B. (ECF No. 10, PageID.1495) (citing SSR 19-4p, 2019 WL 4169635, at *7–8 (August 26, 2019), 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.02 (Mar. 14, 2018)).  She cites her report to her treating sources that beginning in May 2017, she experienced headaches approximately five to eight times a month lasting for one hour.  (ECF No. 10, PageID.1495).

The Commissioner argues conversely that Plaintiff has failed to present any evidence that she either meets or medical equals Listing 11.02B, noting that her report of frequent headaches/migraines, without more, is insufficient. (ECF No. 12, PageID.1523-25).

Primary headache disorder is not included in impairments listed in 20 C.F.R. Part 404, Subpt. P, App. 1. However, the SSA may find that the condition alone or in combination with another impairment(s), medically equals a listing. SSR 19-4p states in relevant part:

> If a person's primary headache disorder, alone or in combination with another impairment(s), does not medically equal a listing at step three of the sequential evaluation process, we assess the person's [RFC]. We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC. . . . We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

SSR 19-4p, at *7–8.

The condition is analyzed under Listing 11.02B or 11.02D, the "most closely analogous listed impairment[s]." *Id.,* at *7.   SSR 19-4p continues in relevant part:

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary

> headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* (citing 20 C.F.R. Part 404, Subpt. P, App. § 11.02 (Mar. 14, 2018)).

The B paragraph of Listing 11.02 (Epilepsy) requires evidence of "[d]yscognitive seizures . . . occurring at least once a week for at least 3 consecutive months . . . despite adherence to prescribed treatment . . ." *Id.* Listing 11.00H1b defines dyscognitive seizures as the "alteration of consciousness without convulsions or loss of muscle control. *Id.* The seizure activity may include "blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) . . ." *Id.*

Plaintiff's contention that the ALJ was required to analyze her headaches under Listing 11.02 is not well taken. First, it is beyond dispute that Plaintiff did not meet Listing 11.02B. The transcript is devoid of any evidence that she experienced the symptoms of dyscognitive seizures during the relative period. While Dr. Sherman opined in May 2018 that Plaintiff experienced disabling migraine headaches, he noted the same month that seizures were "well-controlled" with medication. (ECF No. 7-7, PageID.611, 614). October

2019 records state that Plaintiff had not experience seizures in 10 years.[6]  (ECF

No. 7-2, PageID.49).  Where the claimant "did not point to evidence creating

a   substantial   question"   that   he   could   meet   a   Listing   "the   ALJ

was not required to discuss it." *Brown v. Comm'r of Soc. Sec.*, No. 2:19-cv-

12965, 2021 WL 3240392, at *3 (E.D. Mich. July 30, 2021).

Plaintiff's  argument  that  she  medically  *equaled*  Listing  11.02B  also

fails.  Her claim that for a time, she experienced headaches multiple times a

week,  without  more,  does  not  constitute  a  plausible  argument  that  she

medically equaled Listing 11.02.  Under 20 C.F.R. § 404.1526, "an impairment

is  medically  equivalent  to  a  listed  impairment . . . if  it  is  at  least  equal  in

severity and duration to the criteria of any listed impairment." The regulation

states in relevant part that a finding of medical equivalence can be made where

(b)(1) the claimant has an impairment found among the listed impairments that

(A) does not meet all of the requirements of the listing or, (B) meets all of the

requirements but "one or more of the findings is not as severe as specified in

the particular listing" provided that "other findings related to [the] impairment

... are at least of equal medical significance to the required criteria." *Id.*  "For

a claimant to qualify for benefits by showing that his unlisted impairment, or

combination of impairments, is 'equivalent' to a listed impairment, he must

---

[6]Based on this evidence, the ALJ explicitly found that the condition of epilepsy
was a non-severe impairment.  (ECF No. 7-2, PageID.44-45)

present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990) (emphasis in original).

To be sure, a finding of equivalency under Listing 11.02 can be made without evidence of seizures. *Jandt v. Saul*, No. 1:20-CV-00045, 2021 WL 467200, at *8 (W.D. Ky. Feb. 9, 2021). Symptoms including "aura, alteration of awareness, and intense headache with throbbing and severe pain" with "nausea and photophobia" with the need to "lie down in a dark and quiet room for relief" lasting up to 72 hours twice weekly are sufficient to show medical equivalence. *Id.* (quoting Social Security POMS DI 24505.015(B)(7)(b)). In contrast here, although Plaintiff contends that the frequency of her headaches raised the possibility that she equaled the Listing, again, this alone cannot establish that she medically equals Listing 11.02.

While Plaintiff could have experienced at least one migraine a week over the course of three months, the evidence does not show that she experienced this degree of severity continually for 12 months or more as required to show disability. 20 C.F.R. § 404.1405. The ALJ cited September 2015, showing Plaintiff denied experiencing migraines for several weeks following a medication change. (ECF No. 7-2, PageID.48). He noted that Plaintiff was diagnosed with migraine headaches in July 2016 but as of November 2016 reported that the headaches were quelled with the use of

Topamax. (*Id*. at PageID.49). In May 2017, she reported up to eight headaches a month lasting for about 15 minutes but otherwise was doing well. (*Id*.). In October 2019, Plaintiff reported almost daily headaches but was able to clean houses. (*Id*.). The treating records a repeatedly normal mental status. (*Id*. at PageID.48-49).

Even assuming that Plaintiff could show that she experienced the migraines at the same level of frequency for a continual period, substantial evidence supports the conclusion that she did not regularly experience any of the other symptoms listed in SSR 19-4p to be considered in establishing equivalency, including auras, headaches of extended duration or intensity or ongoing side effects. *Id.* at *7. Treating records consistently show that she was alert, fully oriented, and able to engage in a wide variety of activities. The hospitalization records likewise do not show that she experienced disability level headaches or migraines.

Because Plaintiff cannot demonstrate that she met or equaled Listing 11.02, the ALJ did not err in declining to discuss that Listing or finding that she did not meet or medically equal any listed impairment. The ALJ's step three determination is supported by the findings of both non-examining sources. (ECF No. 7-3, PageID.135-37, 141). *See Smith-Johnson*, 579 F. App'x at 432 ("[N]either the listings nor the Sixth Circuit require the ALJ to "address every listing" or "to discuss listings that the applicant clearly does not

meet.").  As such, the ALJ's step three finding and ultimate determination of non-disability should remain undisturbed.

### Conclusion

For these reasons, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 10), and **GRANTING** the Commissioner's motion (ECF No. 12).

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

 Date: July 12, 2022                              S/ PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge